IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MICHELE MOCK, | ) |
| Plaintiff, | ) |
| | ) CIVIL ACTION NO. 3:04-314 |
| v. | ) |
| | ) |
| UNIVERSITY OF PITTSBURGH AT | ) JUDGE KIM R. GIBSON |
| JOHNSTOWN, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Gibson, J.

### I.  SYNOPSIS

This matter comes before the Court on a Motion for Summary Judgment filed by the Defendant,

the University of Pittsburgh at Johnstown ("UPJ"), pursuant to *Federal Rule of Civil Procedure 56*.

(Document No. 28). The Plaintiff, Dr. Michele Mock ("Dr. Mock") opposes UPJ's Motion for

Summary Judgment. (Document No. 38). This controversy arises out of UPJ's decision to hire a

younger, healthy male applicant for a tenure-stream faculty position instead of Dr. Mock, who is a

slightly older female with an alleged disability. For the following reasons, the Court will grant UPJ's

Motion for Summary Judgment.

### II.  BACKGROUND[1]

The University of Pittsburgh (the "University") is a state-related institution of higher learning

---

[1] Dr. Mock has filed a Concise Statement of Material Facts in opposition to UPJ's Motion for Summary Judgment, but she has not filed a response to UPJ's Concise Statement of Facts in Support of its Motion for Summary Judgment. (Document Nos. 30 & 40). UPJ has filed a response to Dr. Mock's Concise Statement of Material Facts. (Document No. 46). For purposes of the instant summary judgment motion, the Court accepts those facts appearing in UPJ's Concise Statement of Material Facts, to the extent that they are not inconsistent with Dr. Mock's Concise Statement of Material Facts, to be undisputed. Local Rule 56.1(E).

located in Pittsburgh, Pennsylvania. (Document No. 30, p. 1, ¶ 1). UPJ is one of four regional campuses of the University of Pittsburgh. (Id., ¶ 2). The University classifies the members of its faculty into four categories, including professors, associate professors, assistant professors and instructors. (Id., p. 2, ¶ 3). Some faculty appointments are made in the University's "tenure stream," while others are not. (Id., ¶ 4). Someone who is appointed to a tenure stream position must either be promoted to a tenured position after seven years or be terminated from the position. (Id., ¶ 5). Someone who is appointed outside of the tenure stream can be renewed on an ongoing basis, but he or she does not have the potential for tenure. (Id., ¶ 6). Individuals in either category can be terminated for cause. (Id., ¶ 7).

Faculty members in both categories enjoy the same eligibility for employee benefits. (Id., ¶ 8). The determination as to whether a given position is placed within the tenure stream is determined by both the needs of the University and the precise nature of the position at the time of its creation. (Id., ¶ 9). Vacancies in tenure-stream positions generally occur when a tenured faculty member departs. (Id., pp. 2-3, ¶ 10). Although the practice is relatively rare, the Provost occasionally approves the creation of new tenure-stream positions. (Id.). Once a position is created outside of the tenure stream, it remains outside of it. (Id., p. 3, ¶ 11). Positions outside of the tenure stream are not converted into tenure-stream positions. (Id.). Indeed, no faculty member holding a position outside of the tenure stream has ever had his or her position converted into a tenure-stream position in the history of UPJ. (Id.). Nevertheless, faculty members who hold positions outside of the tenure stream remain free to apply for tenure-stream positions for which they are qualified. (Id., ¶ 12).

Many members of UPJ's faculty have been outside of the tenure stream for several years. (Id.,

2

¶ 13). Before a search is commenced to fill a position, the relevant University authorities must approve both the nature of the position and the beginning of the search. (Id., ¶ 15). The University has both Policy 02-02-02, which is a General Appointment and Tenure Policy ("Appointment Policy"), and Policy 07-01-03, which is an Equal Opportunity, Non-discrimination and Affirmative Action Policy ("Equal Opportunity Policy"). (Id., pp. 3-4, ¶ 16). These policies require that positions be openly advertised and that the search process be subject to "affirmative action scrutiny." (Id.). A national search must be conducted to fill full-time tenured and tenure-stream positions. (Id., p. 4, ¶ 17). Over the years, UPJ has informally adopted a "search checklist" for use in faculty searches, along with accompanying legal guidelines. (Id., ¶ 18).

During the past several years, UPJ's English Department has had numerous faculty vacancies and searches. (Id., ¶ 19). The English Department is one component of the Humanities Division. (Id., ¶ 20). Dr. Carroll Grimes ("Dr. Grimes"), a tenured Professor of English Literature, was the Chairperson of the Humanities Division between September 1972 and June 2002. (Id., ¶ 21). In 1969, at the age of 38, she was hired as an Assistant Professor of English Literature within the tenure stream. (Id.). Dr. Grimes was promoted to Associate Professor with tenure in 1972 and to full Professor in 1975. (Id.). Dr. Grimes retired on June 30, 2002, at the age of 71. (Id., p. 5, ¶ 22). During the spring of 2003, she contracted to teach French Composition on a part-time basis. (Id.). When Dr. Grimes retired, Dr. Denis Robitaille ("Dr. Robitaille") replaced her as the Chairman of the Humanities Division. (Id., ¶ 23). Dr. Robitaille held the position between August 2002 and June 30, 2006, when he retired at the age of 62. (Id., ¶ 24).

During the fall of 1995, the English Department sought applications for two new full-time

3

renewable faculty positions outside of the tenure stream. (Id., ¶ 25). One position focused on Creative Writing, while the other one focused on Expository Writing. (Id.). At the time, Dr. Mock, a graduate of UPJ, was in the process of completing her Ph.D. work. (Id., ¶ 26). She applied for the Expository Writing position. (Id.). The search committee recommended Dr. Mock for the position after the completion of the search, and she accepted an offer for a full-time position, outside of the tenure stream, as an Assistant Professor of English/Writing. (Id., pp. 5-6, ¶ 28). The position, which she accepted in March 1996, was scheduled to run from September 1, 1996, through April 30, 1999. (Id.). Dr. Mock has remained employed in this position since that time. (Id., p. 6, ¶ 29).

At the conclusion of Dr. Mock's initial period of appointment, the tenured faculty members within the Humanities Division recommended that the positions held by Dr. Mock and Dr. Jerry Wemple ("Dr. Wemple"), another faculty member within the English Department, be converted into tenure-stream positions. (Id., ¶ 30, n. 2). Dr. Grimes submitted this request to Dr. Sandra Patterson-Randles ("Dr. Patterson-Randles"), who was the Vice President for Academic Affairs. (Id.). Dr. Patterson-Randles indicated that the positions could not be converted into tenure-stream positions, but that Dr. Mock and Dr. Wemple were free to apply for tenure-stream positions when they became available. (Id.). In the spring of 1999, Dr. Wemple accepted a tenure-stream position elsewhere. (Id.).

Since the commencement of her employment with UPJ in 1996, Dr. Mock has undergone formal contract renewal on two occasions. (Id., ¶ 30). She was first renewed in the fall of 1998, for a period running from September 1999 until April 2002. (Id.). She was renewed again in the fall of 2001, for a period running from September 2002 until April 2005. (Id.). Although a third formal contract review for Dr. Mock was about to begin in 2004, UPJ voluntarily implemented two additional one-year

4

extensions of her contract due to extenuating personal circumstances. (Id., pp. 6-7, ¶ 31). As a result of these extensions, Dr. Mock's contract was extended through April 30, 2007. (Id.). Her third reappointment review was scheduled for the fall of 2006. (Id., p. 7, ¶ 32).

Although Dr. Mock has been encouraged to seek promotion to Associate Professor in her existing position, she has apparently declined to do so. (Id., ¶ 33). Such a promotion would result in an increase in her pay and would leave her free to apply for positions within the tenure stream. (Id., ¶ 34). Although Dr. Mock was eligible for other tenure-stream openings within the English Department that have occurred since 1998, she did not apply for them. (Id., ¶ 35). The only tenure-stream position at UPJ for which Dr. Mock has applied is the one which is the subject of this lawsuit. (Id., ¶ 36).

When Dr. Mock was hired in 1996, she was expected to teach various writing courses. (Id., p. 8, ¶ 37). These courses included Freshman Composition, Freshman Writing Seminar, Composition I, Composition II, Descriptive Writing, Informative Writing, Introduction to Creative Writing, Communication I and Communication II. (Id., ¶ 37). The teaching of writing, in one form or another, is the duty of every member of the English Department's faculty. (Id., ¶ 38). Dr. Mock has also taught Reading Poetry, which is a lower level course taught by most members of the English faculty. (Id., ¶ 39). When the initial search was underway in 1996, Dr. Mock identified 19th Century American Women's Literature and Women's Studies as fields of specialization, in addition to Expository Writing. (Id., ¶ 40). She developed a Women in Literature course, which she began to teach during the spring of 1998. (Id., ¶ 41). At the time of the search for the position which is the subject of this lawsuit, Dr. Mock had not taught a class in American Literature. (Id., p. 9, ¶ 42). Nevertheless, some of her courses included components similar to those taught in American Literature. (Id.). Apparently, she wanted to

5

teach American Literature but was not afforded that opportunity. (Id.).

Dr. Mock has done some additional work aside from her job at UPJ. Throughout her time as a member of the UPJ faculty, Dr. Mock has worked as a bartender at a variety of drinking establishments. (Id., ¶ 43). These establishments include Richland Greens, Indian Lake, Crousey's and the Pike Inn. (Id.). She has also done some outside consulting. (Id., p. 10, ¶ 45).

Dr. Mock was diagnosed with multiple sclerosis at some point in 2000. (Document Nos. 40, p. 1, ¶ 1, 46, pp. 1-2, ¶ 1). Dr. Patty Derrick ("Dr. Derrick") served on the committee that recommended a renewal of Dr. Mock's contract in 2001. (Document Nos. 40, p. 2, ¶ 6, 46, pp. 4-5, ¶ 6). Dr. Derrick did not see any evidence that Dr. Mock's medical condition had a physical impact on her. (Id.). In June 2001, Dr. Grimes reported to Dr. Patterson-Randles that Dr. Mock remained "extremely active in her professional activities" despite her "severe health problems." (Document Nos. 40, p. 2, ¶ 7, 46, p. 5, ¶ 7).

In June 2002, UPJ's English Department obtained permission to conduct a search to fill a tenure-stream position that was opening up because of Dr. Grimes' retirement. (Document No. 30, p. 15, ¶ 63). Dr. Robitaille appointed five members to serve on the search committee, including Dr. Catherine Cox ("Dr. Cox"), Dr. Derrick, Dr. James Scofield ("Dr. Scofield"), Dr. Jonathan Ritz ("Dr. Ritz"), and Dr. Paul Newman ("Dr. Newman"). (Id., ¶ 64). Dr. Cox and Dr. Derrick, who were both female tenured Professors of English Literature, were the highest ranking members of the committee. (Id., p. 16, ¶ 66). Dr. Cox chaired the search committee. (Id., ¶ 67). At that time, Dr. Cox was 40 years of age, Dr. Derrick was 49 years of age, Dr. Scofield was 68 years of age, Dr. Ritz was 34 years of age, and Dr. Newman was 34 years of age. (Id., p. 18, ¶ 77).

6

The short-form position announcement indicated that an applicant chosen to fill the position would need to teach First-year Writing, Introductory Literature and general literature courses. (Id., p. 19, ¶ 81). All members of the English faculty taught general literature and writing courses. (Id., ¶ 82). In addition to the information contained in the short-form position announcement, the long-form position announcement stated:

> PhD in hand by start of appointment, in English, with preparation in American Literature; college teaching experience in relevant course areas; evidence of teaching effectiveness; commitment to undergraduate teaching excellence; strong potential and demonstrated preparation for scholarly achievement and professional development. Desired secondary areas might include cultural studies and/or contemporary critical theory, including, for example, gender, religious, ethnic, women's or political studies, contemporary critical theory methods and applications.

(Id., pp. 19-20, ¶ 83). The committee received 141 applications. (Id., ¶ 86). Dr. Mock was one of ten applicants to be selected for a telephone interview. (Id., p. 22, ¶ 91). At the time of this selection, Dr. Mock, who was born on July 5, 1962, was 40 years of age. (Id., p. 23, ¶ 96).

Dr. Carl Silvio ("Dr. Silvio"), another internal applicant from within UPJ, was also selected for a telephone interview. (Id., ¶ 98). He was 35 years of age at the time. (Id., ¶ 99). Dr. David Magill ("Dr. Magill"), who was likewise selected for a telephone interview, was 33 years of age at the time. (Id., pp. 23-24, ¶¶ 100, 103). Of the six other applicants selected for telephone interviews, three were male and three were female. (Id., p. 24, ¶ 104). Apparently, one of the original ten applicants chosen for a telephone interview (a female) declined the offer after accepting a position elsewhere. (Document No. 31-4, p. 7).

Dr. Mock was the subject of an article in *The Advocate*, which is a student newspaper at UPJ.

7

(Document Nos. 40, p. 2, ¶ 8, 46, pp. 5-6, ¶ 8). This article, which was published on March 26, 2003, detailed some of the symptoms caused by Dr. Mock's multiple sclerosis. (Document No. 42-2). According to the article, she experienced symptoms dating back to when she was eighteen years of age, at which point her doctors were unable to give her a definitive diagnosis. (Id.). The article explained that Dr. Mock suffered from frequent pain, occasional cognitive lapses and periodic blindness, but that she was still able to teach effectively. (Id.).

After the completion of telephone interviews, Dr. Mock and Dr. Magill were invited for campus interviews and teaching demonstrations. (Id., p. 26, ¶ 110). Dr. Mock was interviewed on April 4, 2003, and Dr. Magill was interviewed on April 9, 2003. (Id., p. 27, ¶¶ 114-115). They each gave a teaching demonstration in a freshman-level class. (Id., ¶ 117). With the exceptions of Dr. Cox and Dr. Derrick, the committee members had never seen Dr. Mock teach prior to her demonstration. (Id., pp. 27-28, ¶ 118).

On April 11, 2003, a straw vote was taken by the members of the committee indicating that three members favored Dr. Mock and that two members favored Dr. Magill. (Document Nos. 30, p. 28, ¶ 120, 40, p. 3, ¶ 14, 46, pp. 10-11, ¶ 14). Whether this vote was formal or informal is disputed by the parties in this case. (Id.). Apparently, the two members of the committee who voted in favor of Dr. Magill were Dr. Cox and Dr. Derrick. (Document No. 30, p. 29, ¶ 123). There was no formal policy as to how the committee's decision was to be made, or as to how many votes an applicant needed to get in order to be offered the position. (Document No. 40, p. 4, ¶ 21, 46, p. 14, ¶ 21).

In order to determine the status of their ongoing deliberations, the members of the committee subsequently took an anonymous straw vote which resulted in a 4-1 majority in favor of Dr. Magill.

8

(Document No. 30, p. 35, ¶ 133). After additional deliberations, the committee anonymously voted 4-1

in favor of recommending Dr. Magill for the position. (Id., ¶ 135). Thereafter, Dr. Cox drafted a

committee report that was circulated to the other members of the committee for their review and input.

(Id., p. 36, ¶ 138). The final report, which was dated April 18, 2003, and addressed to Dr. Robitaille,

detailed the selection process. (Document No. 41-4, pp. 63-65). In the report, Dr. Cox stated, in

pertinent part, as follows:

> Both are conversant in contemporary critical theory and cultural studies (desired
> secondary interests as per the position advertisement), and both bring to their teaching
> and research activities an enthusiasm and level of engagement befitting UPJ's English
> department and Humanities Division.
>
> However, the scope and breadth of Magill's preparation in American Literature clearly
> exceeds that of Mock, which became evident during the campus interview when each
> was asked an identical question about canonical and non-canonical authors and texts:
> Magill responded with great specificity and broad-based familiarity with both canonical
> and non-canonical authors, citing specific texts and cultural references, and was
> conversant with authors, texts, topics, and genres. Mock, however, did not provide a
> satisfactory answer to this question, instead reiterating the non-canonical Women's
> Studies texts and topics that constitute the basis of her research and much of her
> teaching. The Committee felt, overall, that Magill is fully prepared–having had more
> than double the number of graduate courses taken in American Literature compared to
> those taken by Mock, with a varied record of refereed conference presentations
> reflecting these diverse areas of interest and preparation–to undertake the duties
> required by the position, and that Mock is not yet prepared to do so (the Committee
> observed that Mock is a superior Women's Studies teacher and scholar, but is not an
> American Literature specialist per se).
>
> The Committee's final vote was 4-1 in favor of Magill. Given the majority's concerns
> regarding Dr. Mock's preparation in American Literature, the Committee has decided
> that should Dr. Magill decline the position, we would like to request authorization to
> invite an additional candidate from the applicant pool for an on-campus interview and
> teaching demonstration rather than default to Mock in making any recommendation.
> The overall opinion of the Committee is that David Magill meets or exceeds all stated
> requirements for the position and would be a superior teacher, accomplished scholar,
> and contributing member of the UPJ campus community, and we enthusiastically

9

recommend that he be offered the tenure-track position of Assistant Professor of English.

(Id., p. 65). On April 21, 2003, Dr. Cox emailed the following message to the other members of the

search committee:

Hi again--

I have just delivered to Denis the official English Literature Search Recommendation Report, accompanied by the Affirmative Action Summary Report and Pre-Audit Search Report, which are required of all search recommendations.

As administrative events unfold, I will keep everyone apprised. (Please do keep in mind, too, that should the Affirmative Action office choose to jettison our choice on account of his being a white male (which can, and does, happen, as some of us have witnessed firsthand over the years), we will need to go back to the finalist pool and go through the campus routine one more time . . .)

Thank you all for your diligent, professional, and collegial participation in this process; while any search requires effort and commitment, this one was especially challenging, given the high number of qualified applicants and the sensitive issues related to the internal finalist. I very much appreciate that we could all work together in such a harmonious and purposeful manner, and I really am proud of the fine job that we all did. Hopefully, this is it–thanks again!

(Document No. 41-4, p. 59).

Dr. Robitaille concurred with the committee's recommendation. (Document No. 30, p. 37, ¶ 142). Subsequently, the Vice President for Academic and Student Affairs, Dr. Jerry Samples ("Dr. Samples"), who had personally interviewed both Dr. Mock and Dr. Magill, forwarded a memorandum dated April 24, 2003, to Dr. Albert Etheridge ("Dr. Etheridge"), the President of UPJ, recommending that Dr. Magill be hired. (Id., p. 38, ¶ 145). Having been convinced to follow the recommendation, Dr. Etheridge sought permission from the Provost to enter into negotiations with Dr. Magill. (Id., ¶ 146). Dr. Etheridge's request was approved after the Provost's office certified that the process had been

10

conducted in accordance with the policies of the University. (Id., ¶ 147). Dr. Magill accepted an offer to work as a tenure-stream Assistant Professor of English Literature in May 2003, and he remains employed in this capacity. (Id., p. 39, ¶ 148).

On June 30, 2003, Dr. Mock filed a charge of discrimination with the Pennsylvania Human Relations Commission ("PHRC"). (Id., ¶ 149). This charge was dual-filed with the Equal Employment Opportunity Commission ("EEOC"). (Id.). The EEOC ultimately terminated the processing of the charge, and a right-to-sue letter dated September 23, 2004, was issued to Dr. Mock by District Director Marie M. Tomasso. (Document No. 1, Ex. A). Dr. Mock received this letter on September 27, 2004. (Document No. 1, ¶ 3). Dr. Mock commenced this action on December 22, 2004, alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII") [42 U.S.C. § 2000e *et seq.*], the Age Discrimination in Employment Act (the "ADEA") [29 U.S.C. § 623 *et seq.*], and the Americans with Disabilities Act of 1990 (the "ADA") [42 U.S.C. § 12101 *et seq.*]. (Id., ¶¶ 20-43). She contends that she was not hired for the tenure-stream position on account of her gender, age, or alleged disability. (Id.).

## III. SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265, 273-280 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211-212 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. And Loan Ass'n v. Fidelity and Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)]."

*Troy Chemical Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

11

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. See generally 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## IV. JURISDICTION AND VENUE

This Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. 1343(a)(4) and

42 U.S.C. § 2000e-5(f)(3). Venue is proper under 28 U.S.C. § 1391(b).

## V. DISCUSSION

Although Dr. Mock asserts claims under three different federal anti-discrimination statutes, the factual inquiry in this case is quite narrow. Despite the misleading and out-of-context use of the words "discharge" and "dismissal" throughout Dr. Mock's complaint, it is clear that the allegations contained therein concern only UPJ's decision to hire Dr. Magill as opposed to Dr. Mock. (Document No. 1, ¶¶ 10-19). In Count I of her complaint, Dr. Mock claims that UPJ's decision not to hire her for the tenure-stream position violated the ADEA. (Id., ¶¶ 20-24). In Count II, she alleges that UPJ's decision constituted a violation of the ADA. (Id., ¶¶ 25-37). Finally, in Count III, she claims that UPJ's decision violated Title VII. (Id., ¶¶ 38-43). UPJ moves for summary judgment as to all three counts. (Document

12

No. 28). In addition, UPJ seeks the dismissal of Dr. Mock's claim for punitive damages under the ADA on the ground that UPJ is a "government agency" within the meaning of 42 U.S.C. § 1981a(b)(1) and, therefore, immune from an award of punitive damages. (Document No. 29, pp. 26-30). The Court will discuss each of the four issues separately.

At the outset, however, there are a few preliminary points worth noting. Since this is a federal employment discrimination case in which no direct evidence of discrimination is presented, the general analysis adopted by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L.Ed.2d 668, 93 S.Ct. 1817 (1973), provides the formulation for allocating the appropriate burdens of proof and production in evaluating the present Motion for Summary Judgment. As a general matter, in a federal employment discrimination case, the plaintiff must establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824, 36 L.Ed.2d at 677-678. If a *prima facie* case is established, the defendant must then articulate a legitimate, nondiscriminatory reason for treating the plaintiff (i.e., the employee) in an adverse manner. *McDonnell Douglas*, 411 U.S. at 802-803, 93 S.Ct. at 1824-1825, 36 L.Ed.2d at 678. If the defendant articulates legitimate, nondiscriminatory reasons for the employee's treatment, the plaintiff must demonstrate that the reasons given by the defendant for the plaintiff's treatment are merely a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804-805, 93 S.Ct. at 1825-1826, 36 L.Ed.2d at 678-679.

The requirement that the plaintiff establish a *prima facie* case under the federal employment discrimination statutes "is not intended to be onerous." *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), cert. denied, 515 U.S. 1159, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995). A *prima facie* case raises an inference of discrimination because the courts presume that the challenged acts, if

13

left unexplained, are "more likely than not based on the consideration of impermissible factors." *Id.* It must be remembered, however, that the *McDonnell Douglas* formulation "was never intended to be rigid, mechanized, or ritualistic." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978). This is particularly true with respect to the plaintiff's need to establish a *prima facie* case. In *Jones v. School District of Philadelphia*, 198 F.3d 403, 411 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained that "the elements of a *prima facie* case depend on the facts of the particular case[,]" and that "a *prima facie* case cannot be established on a one-size-fits-all basis." Thus, "the *prima facie* test remains flexible and must be tailored to fit the specific context in which it is applied." *Sarullo v. United States Postal Service*, 352 F.3d 789, 797-798 (3d Cir. 2003). With that in mind, the Court now turns to the specific claims asserted by Dr. Mock in this case.

## A. Age Discrimination under the ADEA

Count I of Dr. Mock's complaint alleges a violation of the ADEA. (Document No. 1, ¶¶ 20-24). Although portions of this count refer to Dr. Mock's "dismissal," it is clear from the factual background section of the complaint that this allegation concerns only UPJ's decision to hire Dr. Magill, rather than Dr. Mock, for the tenure-stream position at issue. (Id., ¶¶ 10-19). In other words, Dr. Mock was not actually "dismissed," but rather "not hired" or "not promoted."

UPJ does not dispute that it is "a person[2] engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current

---

[2] The ADEA defines a "person" as "one or more individuals, partnerships, associations, labor organizations, corporations, business trusts, legal representatives, or any organized groups of persons." 29 U.S.C. § 630(a).

14

or preceding calendar year[.]" 29 U.S.C. § 630(b). Therefore, UPJ is an "employer" within the meaning

of the ADEA. Moreover, Dr. Mock is an "employee" under 29 U.S.C. § 630(f). The relevant

substantive provisions of the ADEA provide:

§ 623. Prohibition of age discrimination

(a) Employer practices. It shall be unlawful for an employer--

(1) to fail or refuse to hire or to discharge any individual or otherwise
discriminate against any individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's age;

(2) to limit, segregate, or classify his employees in any way which would deprive
or tend to deprive any individual of employment opportunities or otherwise adversely
affect his status as an employee, because of such individual's age; or

(3) to reduce the wage rate of any employee in order to comply with this Act.

29 U.S.C. § 623(a)(1)-(3). Under § 631(a), the prohibitions contained in the ADEA are "limited to

individuals who are at least 40 years of age." Hence, only those over the age of 40 may invoke the

provisions of the ADEA.

The *McDonnell Douglas* framework does not apply in employment discrimination cases in

which there is direct evidence of discrimination. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511, 122

S.Ct. 992, 997, 152 L.Ed.2d 1, 9 (2002). In such cases, there is no need for an "inference of

discrimination," since the discrimination is readily apparent. Direct evidence of discrimination is

evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any

presumption from the *prima facie* case to shift the burden of production." *Starceski v. Westinghouse

Elec. Corp.*, 54 F.3d 1089, 1096, n. 4 (3d Cir. 1995). Dr. Mock, however, has produced no direct

evidence of age discrimination. Consequently, she must establish a *prima facie* case of age

discrimination pursuant to the general *McDonnell Douglas* framework.

15

In order for Dr. Mock to establish a *prima facie* case of age discrimination under the ADEA, she must show that: (1) she was in the protected class (i.e., she was "at least 40 years of age" under § 631(a)); (2) she was qualified for the position at issue; (3) she suffered an adverse employment action (i.e., UPJ "fail[ed] or refuse[d] to hire" her within the meaning of § 623(a)(1)); and (4) she was treated differently than a sufficiently younger and similarly situated person, thereby raising an inference of age discrimination. *Johnson v. McGraw-Hill Companies*, 451 F.Supp.2d 681, 694 (W.D.Pa. 2006). If Dr. Magill was not sufficiently younger than Dr. Mock to permit a reasonable jury to infer that Dr. Mock was not hired because of her age, Dr. Mock can still make a *prima facie* showing of age discrimination by presenting additional evidence which tends to support an inference that she was not hired on account of her age. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa. 2005). At the time of UPJ's decision to hire Dr. Magill, Dr. Mock was 40 years of age. For purposes of this analysis, the Court assumes *arguendo* that Dr. Mock was qualified for the position. Since she was not hired, the third element is clearly met. The failure or refusal to hire an applicant constitutes an adverse employment action, since it falls squarely within the language of § 623(a)(1). Nevertheless, Dr. Mock fails to establish a *prima facie* case of age discrimination because she cannot show that she was treated differently than a *sufficiently younger* and similarly situated person. Moreover, she has presented no additional evidence which creates an inference of age discrimination when combined with a showing that she was treated differently than an *insufficiently younger* person.

In her brief, Dr. Mock contends that she has established a *prima facie* case of age discrimination by showing that she was over the age of 40 at the time of the decision, that Dr. Magill was under the age of 40, and that she was more qualified for the position that he was. (Document No. 39, p. 11). She

16

bases her argument primarily on the alleged actions of Dr. Cox and Dr. Derrick. (Id., p. 24)("Basically, Drs. Cox and Derrick sabotaged the process by seeking to have Dr. Magill put in the position because Dr. Mock is a female, over the age of forty (40), with a known disability."). With respect to her claim under the ADEA, it is clear that Dr. Mock fundamentally misunderstands the *prima facie* inquiry.

Since Dr. Mock was 40 years of age at the time of UPJ's decision not to hire her for the tenure-stream faculty position, she falls within the class of individuals protected by the ADEA. 29 U.S.C. § 631(a). All that this means, however, is that she is not categorically excluded from the ADEA's protections. In *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996), the United States Supreme Court held that the statutory provision limiting the ADEA's protection to those who have reached the age of 40 is relevant for no purpose other than determining whether an individual is within the class of persons protected by the ADEA. The fact that Dr. Mock was within the protected class at the time of the adverse employment action, while Dr. Magill was not, is of no legal significance. "Because the ADEA prohibits discrimination on the basis of age and not class membership, the fact that a replacement is substantially younger than the plaintiff is a far more reliable indicator of age discrimination than is the fact that the plaintiff was replaced by someone outside the protected class." *O'Connor*, 517 U.S. at 313, 116 S.Ct. at 1310, 134 L.Ed.2d at 439. The Supreme Court clearly explained the relationship between the substantive provisions of the ADEA and § 631(a) in *O'Connor*:

> The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," 29 U.S.C. § 623(a)(1), though the prohibition is "limited to individuals who are at least 40 years of age," § 631(a). This language does not ban discrimination against employees because they are aged 40 or older; it bans discrimination against employees because of their age, but limits the protected class to

17

those who are 40 or older. The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age*. Or to put the point more concretely, there can be no greater inference of *age* discrimination (as opposed to "40 or over" discrimination) when a 40-year-old is replaced by a 39-year-old than when a 56-year-old is replaced by a 40-year-old. Because it lacks probative value, the fact that an ADEA plaintiff was replaced by someone outside the protected class is not a proper element of the *McDonnell Douglas* prima facie case.

*O'Connor*, 517 U.S. at 312, 116 S.Ct. at 1310, 134 L.Ed.2d at 438 (emphasis in original). The dispositive question for purposes of the instant matter is whether a reasonable jury could draw an inference that Dr. Mock's age "actually motivated" UPJ's decision not to hire her from the fact that a 33-year-old applicant was chosen over her. *Glanzman v. Metropolitan Management Corporation*, 391 F.3d 506, 512 (3d Cir. 2004). In this context, Dr. Mock's age "actually motivated" UPJ's decision not to hire her if her age actually played a role in UPJ's decisionmaking process and "had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105, 116 (2000). What matters is whether the decision was made on the basis of Dr. Mock's *age*, not whether someone outside of § 631(a)'s class was chosen over her.[3]

At the time of UPJ's decision to hire Dr. Magill, Dr. Mock was 40 years of age and Dr. Magill

---

[3] By stressing the word "age" for the purpose of explaining the correct legal standard, the Court does not mean to suggest that the age discrimination prohibited by the ADEA is essentially the same as the gender discrimination prohibited by Title VII. In *General Dynamics Land Systems, Inc. v. Cline*, 540 U.S. 581, 124 S.Ct. 1236, 157 L.Ed.2d 1094 (2004), the United States Supreme Court held that the ADEA does not prohibit discrimination against younger individuals. The Supreme Court explained that, within the context of § 623(a)(1), the words "because of such individual's age" essentially mean "because of such individual's [old or advanced]age." *General Dynamics*, 540 U.S. at 594-600, 124 S.Ct. at 1245-1249, 157 L.Ed.2d at 1109-1113. Unlike Title VII, which prohibits gender discrimination in both directions, the ADEA only prohibits age discrimination in one direction (i.e., discrimination which favors the young and disfavors the old). Since Dr. Mock is older than Dr. Magill, however, *General Dynamics* is not relevant to the Court's analysis. The Court's use of terms such as "age discrimination" refers to discrimination which favors a younger individual at the expense of an older individual.

18

was 33 years of age. For purposes of the *prima facie* inquiry, the dispositive question is whether Dr. Magill was *sufficiently younger* than Dr. Mock to create an inference that age had a determinative influence on UPJ's hiring decision. A close examination of the relevant precedents reveals that courts have generally not regarded a seven-year age difference as being sufficient to create an inference of unlawful age discrimination. *Narin v. Lower Merion School Dist.*, 206 F.3d 323, 333, n. 9 (3d Cir. 2000)(finding that a 56-year-old could not show a "material" difference in age between herself and two individuals at the ages of 49 and 54); *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1029 (7th Cir. 1998)(describing a seven-year age difference as a "presumptively insubstantial gap"); *Bernard v. Bethenergy Mines, Inc.*, 837 F.Supp. 714, 716-717 (W.D.Pa. 1993)(finding an age difference of six or seven years to be insufficient to create an inference of age discrimination). Hence, Dr. Mock cannot establish a *prima facie* case under the ADEA *only* by showing that the person chosen for the tenure-stream position was seven years younger than she was. Nevertheless, the touchstone of the inquiry is whether she has put forth evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion. *O'Connor*, 517 U.S. at 312, 116 S.Ct. at 1310, 134 L.Ed.2d at 438. For this reason, a seven-year age difference (or any insignificant age difference, for that matter) could create an inference of age discrimination if it is coupled with other evidence that tends to support the plaintiff's allegation that an adverse employment action was taken against her because of her age.[4]

---

[4] The Court agrees with UPJ's argument that Dr. Mock fundamentally misunderstands the nature of the *prima facie* inquiry under the ADEA. Nevertheless, the Court does not agree with UPJ's argument that a seven-year age difference is insufficient as a matter of law to establish a *prima facie* case of age discrimination. (Document No. 45, p. 4). The difference in age between the two applicants is relevant for its *evidentiary value* (or lack thereof) in creating an inference that age actually motivated (or did not motivate) UPJ's decision. *O'Connor v. Consolidated Coin Caterers Corporation*, 517 U.S. 308, 312-313, 116 S.Ct. 1307, 1310, 134 L.Ed.2d 433, 438-439 (1996). If a slight difference in age is accompanied by other circumstantial evidence which tends to support an inference that age actually motivated the employer's decision, a plaintiff can satisfy the *prima facie* hurdle. *Fitzpatrick v. National Mobile Television*, 364 F.Supp.2d 483, 491-492, n. 4 (M.D.Pa.

19

*Jehling v. Mellon Bank, N.A.*, 2006 WL 1508963, at \*6, 2006 U.S. Dist. LEXIS 35240, at \*16-17 (W.D.Pa. May 31, 2006)("Although the Court of Appeals for the Third Circuit has not yet established a bright line rule regarding the age difference that will satisfy the 'sufficiently younger' element, it has found that *absent other evidence*, an age difference of as much as seven years is not sufficient to support an inference of discrimination.")(emphasis added). The question that must be answered is whether any additional evidence exists in this case which, when combined with the insignificant age difference between Dr. Mock and Dr. Magill, creates an inference that UPJ unlawfully relied on Dr. Mock's age when it decided not to hire her.

Having reviewed the evidence presented by Dr. Mock in opposition to UPJ's Motion for Summary Judgment, the Court can find *no* additional evidence that, when combined with the seven-year age difference between Dr. Mock and Dr. Magill, could create an inference of age discrimination in the mind of a *reasonable* jury. (Document Nos. 41 & 42). Indeed, the Court does not understand Dr. Mock to even argue that such evidence exists.[5] She apparently believes that the age difference is itself

---

2005). The Court understands the question of whether Dr. Magill was "sufficiently younger" than Dr. Mock to create an inference of age discrimination to be merely one part of a larger inquiry as to whether the overall evidence would enable a reasonable jury to conclude that Dr. Mock was not hired because of her age. Age discrimination favoring a younger applicant over an older applicant runs afoul of the ADEA even if the two applicants are relatively close in age. The difference in age is relevant only for its evidentiary value (or lack thereof) in showing that age did (or did not) motivate the employer's decision. In this case, the record is devoid of evidence that age played a role in UPJ's decision to hire Dr. Magill rather than Dr. Mock. Thus, the seven-year age difference between the applicants is the *only* evidence relied upon by Dr. Mock to create an inference that her age actually motivated UPJ's decision. The Court agrees with UPJ that this age difference, standing alone, is insufficient to allow Dr. Mock's ADEA claim to proceed beyond the *prima facie* stage.

[5] It is clear than an individual can be discriminated against on the basis of an unlawful trait even if the person guilty of the discrimination shares that same trait. Thus, the fact that Dr. Cox and Dr. Derrick were 40 and 49 years of age, respectively, is not dispositive in this case. (Document No. 30, p. 18, ¶ 77). Nevertheless, this fact does tend to undermine the credibility of Dr. Mock's assertion that Dr. Cox (who was the same age as Dr. Mock) and Dr. Derrick (who was nine years older than Dr. Mock) did not want to hire Dr. Mock *because of her age. Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 354-355 (3d Cir. 1999)(noting that while a woman who was replaced by another woman may be able to demonstrate that she was dismissed because of her gender, the fact that she was replaced by another woman has some

20

sufficient to establish a *prima facie* case under the ADEA, when that difference is coupled with a

showing that she was more qualified than Dr. Magill for the tenure-stream position. (Document No.

39, p. 11). Without expressing an opinion as to which applicant was more qualified for the position in

question, the Court holds that Dr. Mock has failed to present evidence sufficient to enable a reasonable

jury to conclude that UPJ "fail[ed] or refuse[d] to hire" her on account of her age. 29 U.S.C. §

623(a)(1). Since Dr. Mock has failed to establish a *prima facie* case of age discrimination, UPJ is

entitled to summary judgment with respect to Count I of Dr. Mock's complaint.[6]

---

evidentiary force in support of the employer's assertion that gender played no role in the dismissal decision).

[6] Dr. Mock appears to believe that the United States Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003), introduced a new analytical framework for evaluating the evidence in federal employment discrimination cases. (Document No. 39, pp. 9-10). *Desert Palace* did no such thing. *Desert Palace* involved the construction of 42 U.S.C. § 2000e-2(m), which provides: "Except as otherwise provided in this title [42 U.S.C. § 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." This provision was codified via the Civil Rights Act of 1991, which does not apply to ADEA cases. *Glanzman v. Metropolitan Management Corporation*, 391 F.3d 506, 512, n. 3 (3d Cir. 2004). In *Desert Palace*, the Supreme Court held that, in order to obtain a "mixed-motive" instruction pursuant to § 2000e-2(m), "a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace*, 539 U.S. at 101, 123 S.Ct. at 2155, 156 L.Ed.2d at 95-96. In other words, a mixed-motive instruction under § 2000e-2(m) can be obtained even without direct evidence of discrimination. *Desert Palace* is irrelevant with respect to Dr. Mock's claims under the ADEA and the ADA, since § 2000e-2(m) applies only to her Title VII claim. *Benko v. Portage Area School District*, 2006 WL 1698317, at *6, 2006 U.S. Dist. LEXIS 40573, at *16-19 (W.D.Pa. June 19, 2006). The United States Court of Appeals for the Third Circuit has recognized Justice O'Connor's opinion concurring in the judgment as the controlling opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). *Conoshenti v. Public Service Electric & Gas Company*, 364 F.3d 135, 148, n. 11 (3d Cir. 2004). To the extent that Dr. Mock wishes to proceed under a "mixed-motive" theory pursuant to *Price Waterhouse* with respect to her claim under the ADEA, her inability to produce direct evidence of discrimination is fatal to her claim. *Price Waterhouse*, 490 U.S. at 276, 109 S.Ct. at 1804, 104 L.Ed.2d at 304 (O'Connor, J., concurring in the judgment)("In my view, in order to justify shifting the burden on the issue of causation to the defendant, a disparate treatment plaintiff must show by direct evidence that an illegitimate criterion was a substantial factor in the decision."). Even if Dr. Mock were not required to produce direct evidence of discrimination to proceed under a mixed-motive theory, however, UPJ would be entitled to summary judgment because of Dr. Mock's inability to produce circumstantial evidence of age discrimination. *Snik v. Verizon Wireless*, 2004 WL 1490354, at *2, 2004 U.S. Dist. LEXIS 12622, at *9 (E.D.Pa. July 1, 2004)("In any event, in this case we need not decide whether Plaintiff is required to present direct evidence of discrimination to proceed under a mixed-motive theory. In our earlier Memorandum and Order, we considered all the evidence that Plaintiff presented (direct, circumstantial, and evidence of a pretext), and failed to find a genuine issue of material fact to support an inference of discrimination.").

Even if the Court were to assume *arguendo* that Dr. Mock has established a *prima facie* case of age discrimination, UPJ has articulated legitimate, nondiscriminatory reasons for its decision not to hire her. Dr. Cox testified that Dr. Mock had been unable to talk extensively about canonical authors in American literature. (Document No. 31-4, p. 23). According to Dr. Derrick, Dr. Mock had "serious gaps" in her knowledge of canonical authors. (Document No. 33-11, pp. 40-41). Although Dr. Scofield considered Dr. Mock to be an expert in American literature, he apparently did not believe that one needed a high degree of specialization in order to teach undergraduate students. (Document Nos. 34-3, p. 3, 34-4, p. 15). UPJ's proffered reason for not hiring Dr. Mock is also corroborated by the testimony of Dr. Newman, who indicated that Dr. Mock had seemed to focus specifically on women's literature rather than on American literature in general. (Document No. 33-14, p. 8).

Dr. Mock has produced no evidence that the reasons given by UPJ for its decision are a pretext for age discrimination. Moreover, at the time of UPJ's decision, Dr. Cox was 40 years of age and Dr. Derrick was 49 years of age. (Document No. 30, p. 18, ¶ 77). Dr. Mock appears to place most of the blame for the alleged discrimination on Dr. Cox and Dr. Derrick. (Document No. 39, p. 24). Her allegations of age discrimination are somewhat weakened by the fact that one of the relevant decisionmakers was the same age as her, while the other one was nine years older than her. *Ziegler v. Delaware County Daily Times*, 128 F.Supp.2d 790, 811-812, n. 47 (E.D.Pa. 2001). Consequently, UPJ would be entitled to summary judgment even if Dr. Mock were able to establish a *prima facie* case of age discrimination.

## B. Disability Discrimination Under the ADA

Count II of Dr. Mock's complaint alleges a violation of the ADA. (Document No. 1, ¶¶ 25-37).

22

UPJ does not dispute that it is a "covered entity" within the meaning of 42 U.S.C. § 12111(2). The term

"covered entity" is defined as "an employer, employment agency, labor organization, or joint labor-

management committee." 42 U.S.C. § 12111(2). The term "employer" means "a person engaged in

an industry affecting commerce who has 15 or more employees for each working day in each of 20 or

more calendar weeks in the current or preceding calendar year . . ." 42 U.S.C. § 12111(5)(A). UPJ falls

within these definitions. Moreover, it is undisputed that Dr. Mock is an "employee" within the meaning

of § 12111(4).

Since Dr. Mock's claim arises under the ADA, the statutory definition of the term "disability"

is controlling in this case. The ADA, in pertinent part, provides:

> (2) Disability. The term "disability" means, with respect to an individual--
> (A) a physical or mental impairment that substantially limits one or more of the
> major life activities of such individual;
> (B) a record of such an impairment; or
> (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). Given that Dr. Mock's claim deals with an employment-related situation, this

case is governed by 42 U.S.C. § 12112(a), which provides:

> (a) General rule. No covered entity shall discriminate against a qualified individual with
> a disability because of the disability of such individual in regard to job application
> procedures, the hiring, advancement, or discharge of employees, employee
> compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). A plaintiff establishes a *prima facie* case of discrimination under the ADA by

demonstrating that: (1) she is a "qualified individual with a disability" under the ADA; (2) she is

otherwise qualified to perform the essential functions of the job, with or without reasonable

23

accommodations by the employer; and (3) she has suffered an adverse employment decision as a result of discrimination. *Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 761 (3d Cir. 2004). The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

Although the *McDonnell Douglas* burden-shifting framework applies to some ADA cases, it is inapplicable to others. Disparate treatment claims are analyzed pursuant to the *McDonnell Douglas* framework, while failure to accommodate claims are not. *Johnson*, 451 F.Supp.2d at 700, n. 11. In a disparate treatment case, a plaintiff can establish a violation of the ADA without direct evidence of discrimination by relying on the *McDonnell Douglas* framework. *Id.* In a failure to accommodate case, a plaintiff can establish a violation of the ADA by showing that her employer should have reasonably accommodated her but failed to do so. *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1283 (7th Cir. 1996). In the latter type of case, "[t]here is no need for indirect proof or burden shifting." *Id.* This is because an employer's failure to accommodate a disabled employee is *itself* "discrimination" within the meaning of the ADA. 42 U.S.C. § 12112(b)(5)(A)-(B). The Court does not understand Dr. Mock's argument to be that hiring her for the tenure-stream faculty position would have accommodated her disability. Instead, she appears to allege that she was subjected to disparate treatment on account of her alleged disability. (Document No. 1, ¶¶ 34-35). Moreover, she has presented no direct evidence of unlawful discrimination. Therefore, the Court's analysis must proceed according to the general framework established in *McDonnell Douglas*.

The first question that must be answered is whether a reasonable jury could conclude that Dr.

Mock, at the time of the alleged discrimination, was a "qualified individual with a disability." 42 U.S.C. § 12111(8). It is clear that she assumes (rather than argues) that she was. (Document No. 39, pp. 14-29). UPJ argues that Dr. Mock was not "disabled" for purposes of the ADA. (Document No. 29, pp. 19-26). In support of her assertion that she was disabled, Dr. Mock relies on her diagnosis of multiple sclerosis. (Document No. 39, p. 4). Although UPJ appears to question whether Dr. Mock actually suffers from multiple sclerosis, it concedes that point for purposes of the summary judgment inquiry. (Document No. 29, p. 19, n. 13). Consequently, the Court assumes *arguendo* that Dr. Mock suffered from multiple sclerosis at the time of the alleged discrimination. Furthermore, UPJ concedes that multiple sclerosis qualifies as a "physical impairment" within the meaning of § 12102(2)(A).[7] (Id., p. 19). The question before the Court is whether this conceded physical impairment "substantially limit[ed] one or more of the major life activities" of Dr. Mock at the time of UPJ's decision to hire Dr. Magill instead of her. 42 U.S.C. § 12102(2)(A). The EEOC has promulgated regulations to provide guidance as to how this inquiry should proceed:

(i) *Major Life Activities* means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.[8]

---

[7] The EEOC has defined a "physical impairment" as "[a]ny physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine[.]" 29 C.F.R. § 1630.2(h)(1). The United States Supreme Court has assumed *arguendo* that the EEOC regulations interpreting the term "disability" in the ADA are valid, even though the ADA does not expressly give the EEOC the authority to issue such regulations. *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 194, 122 S.Ct. 681, 689, 151 L.Ed.2d 615, 629 (2002); *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 479-480, 119 S.Ct. 2139, 2145, 144 L.Ed.2d 450, 460-461 (1999). Since the parties in this case do not question the validity of the regulations, the Court has no occasion to consider whether the EEOC exceeded its authority in promulgating them. *Williams v. Philadelphia Housing Authority Police Department*, 380 F.3d 751, 762, n. 7 (3d Cir. 2004).

[8] The United States Supreme Court has not held that the category of "major life activities" referenced in 42 U.S.C. § 12102(2)(A) is broad enough to include the activity of "working." *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 200, 122 S.Ct. 681, 692-693, 151 L.Ed.2d 615, 632-633 (2002). Instead, it has assumed *arguendo*

(j) *Substantially limits*–(1) The term *substantially limits* means:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(i)-(j). In *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 482, 119 S.Ct. 2139, 2146, 144 L.Ed.2d 450, 462 (1999), the United States Supreme Court explained that "[a] disability exists only where an impairment substantially limits a major life activity, not where it might, could, or would be substantially limiting if mitigating measures were not taken." *Sutton*, 527 U.S. at 482, 119 S.Ct. at 2146, 144 L.Ed.2d at 462 (internal quotation marks omitted). The statutory language clearly requires that the disability inquiry be made "with respect to an individual[.]" 42 U.S.C. § 12102(2). "Thus, whether a person has a disability under the ADA is an individualized inquiry." *Sutton*, 527 U.S. at 483, 119 S.Ct. at 2147, 144 L.Ed.2d at 463. In *Emory v. Astrazeneca Pharmaceuticals LP*, 401 F.3d 174, 182 (3d Cir. 2005), the United States Court of Appeals for the Third Circuit explained that "even if two different plaintiffs alleging substantial limitations suffer from the same impairment, the nuances of its effect on their daily lives will invariably manifest themselves in distinct ways." In determining whether

---

that working is properly characterized as a major life activity, despite the conceptual difficulty presented by such a characterization. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492, 119 S.Ct. 2139, 2151, 144 L.Ed.2d 450, 468 (1999)(noting that an argument that working is a major life activity seems like a circular argument, since the underlying inquiry is whether one's exclusion from work constitutes discrimination on the basis of an impairment which substantially limits a major life activity). UPJ does not argue that "working" cannot be properly characterized as a "major life activity." (Document No. 29, p. 21). Instead, UPJ argues that Dr. Mock was not substantially limited in the activity of "working" at the time of the alleged discrimination. (Id.). Accordingly, the Court assumes *arguendo* that "working" is a "major life activit[y]" within the meaning of § 12102(2)(A). *Guzman-Rosario v. United Parcel Service, Inc.*, 397 F.3d 6, 10-11 (1ˢᵗ Cir. 2005)(noting that the Supreme Court has expressed doubt as to whether "working" qualifies as a "major life activity," and assuming *arguendo* that it does).

26

a plaintiff's impairment substantially limits a major life activity, consideration must be given to: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2).

In her brief, Dr. Mock makes no attempt to explain how her multiple sclerosis renders her "disabled" within the meaning of the ADA. (Document No. 39, pp. 14-15). Instead, she only explains why she believes that Dr. Derrick (a member of the selection committee) knew that she had multiple sclerosis. (Id.). In her complaint, Dr. Mock alleges that she "suffers from multiple sclerosis, a disease which causes muscle weakness[.]" (Document No. 1, ¶ 31). Although she generalizes about the "debilitating" effect that this disease had on her life at the time of the alleged discrimination, she makes no attempt to tailor her arguments to the statutory framework. (Document No. 39, p. 15). No guidance is provided as to which *major* life activities are *substantially* limited by her multiple sclerosis. Nevertheless, the Court will briefly review the scant medical evidence contained in the record.

Dr. Mock was apparently diagnosed with multiple sclerosis in 2000.[9] In a letter dated September 26, 2000, Dr. Vijay R. Ragoor ("Dr. Ragoor") indicated that undue stress could exacerbate Dr. Mock's "progressive health problems." (Document No. 41-3, p. 4). In a treatment note dated April 5, 2001, Dr. Brian Ahlstrom ("Dr. Ahlstrom") noted that Dr. Mock had been diagnosed with multiple sclerosis. (Document No. 31-11, p. 11). In a June 11, 2001, letter to Dr. Grimes, Dr. Ahlstrom stated that "unnecessary stress" could "cause an increase in the exacerbations of [Dr. Mock's] disease."

---

[9] Dr. Mock's PHRC charge indicates that she was diagnosed with multiple sclerosis in November 2000, on the Wednesday before Thanksgiving. (Document No. 34-12, p. 5). A letter from Dr. Vijay R. Ragoor, however, indicates that Dr. Mock's multiple sclerosis had been diagnosed by September 26, 2000. (Document No. 41-3, p. 4).

(Document No. 41-3, p. 2). Dr. Ahlstrom saw Dr. Mock on February 4, 2003. (Document No. 31-12,

p. 2). He reported that she was doing "quite well." (Id.). In September 2003, pursuant to a request

from Dr. Charles Stotler ("Dr. Stotler"), Dr. Mock obtained a handicapped parking permit. (Document

No. 31-11, pp. 6-8).

On November 7, 2003, Dr. Mock was evaluated by Mary Louise Wargo ("Wargo"), a physical

therapist. (Document No. 31-12, pp. 5-6). Dr. Mock indicated that she was having balance problems,

and Wargo found "evidence of disequilibrium." (Id., p. 6). Although Dr. Mock performed well on

various tests, Wargo reported Dr. Mock's deficits as follows:

> Reports a feeling of imbalance especially in a backwards direction when performing
> upward vertical head and eye movements (smooth pursuits and saccads).
> Poor posturing noted with rounding of the upper back (limited bilateral shoulder flexion
> of 150 [degrees]) and increased lumbar lordosis.
> Mild hamstring tightness left greater than right.
> Difficulty with tandem stance and single one-leg stance eyes opened requiring increased
> use of arm to maintain balance.
> Increased difficulty maintaining balance with tandem and single one-leg stance eyes
> closed.
> Decreased CTSIB score at 201.53/360 with patient having difficulty standing on foam
> both eyes opened/eyes closed.
> Decreased Functional Reach score at 7 inches right and 8 [1/2] inches left.

(Id., pp. 5-6). On January 11, 2006, Dr. Gary S. Kramer ("Dr. Kramer") noted that Dr. Mock had a

"[q]uestionable past medical history of [multiple sclerosis]." (Id., p. 8).

Dr. Mock's deposition testimony also sheds some light on the degree of limitation caused by

her multiple sclerosis:

> [Attorney Noonan]: At any point that you've had MS and you've had MS during the
> entire time you've worked at the university, did you ever indicate to anyone at the
> university that you cannot perform the duties of your job because of your condition of

28

MS?

[Dr. Mock]: No, but I know that I have expressed fear and reservation, and others have expressed the same because MS is I will say again is a chronic as well as a progressive disease. At some point, I will not be able to function at all. At some point, I will not be able to walk. At some point, my vision—I will go completely blind. At some point, I will not be able to eat solid food. At some point, I will not be able to read anymore. I've had periods of this happen, but I have--

[Attorney Noonan]: Now, let me ask--

[Dr. Mock]: It's a progressive disease. You don't know—I don't know how to say it any more clearly.

***

[Attorney Noonan]: Is it your assessment that the multiple sclerosis was limiting your ability to do your job in March or April of 2003 in any significant way?

[Dr. Mock]: But I didn't say that. I didn't say that.

[Attorney Noonan]: No, I'm asking the question. Is it your recollection that it was limiting you in any material way in March or April of 2003?

[Dr. Mock]: You're asking me to take a disease and isolate it to one aspect of my life, and I can't. I'm telling you as much as I wish I could give you an answer, I cannot answer that.

[Attorney Noonan]: Okay.

[Dr. Mock]: It's impossible for me to compartmentalize the disease that way. This affects every aspect of my life and I have to battle it every moment, walking or not. I have to tell myself to breathe. I can't speak loudly if I would like to. I can't see out of one eye. I'm going blind. When did all this start? It's been going on since I was 18 apparently. I wish I could. I can't. I'm sorry. I wish I could answer that question, but I don't know how to answer it.

***

[Attorney Noonan]: Are you still able to drive on your own?

[Dr. Mock]: I have difficulty driving at night sometimes.

[Attorney Noonan]: At night?

[Dr. Mock]: Yes, sometimes.

[Attorney Noonan]: Are you able to cook and clean the house yourself?

[Dr. Mock]: Sometimes.

[Attorney Noonan]: Do you have any restrictions placed on you by your physicians in terms of lifting objects or working with a computer?

[Dr. Mock]: Not at this point, no. It's mostly my vision and cognitive, and I have cognitive difficulties.

[Attorney Noonan]: You've described to me your vision problems. You're losing sight in which eye?

[Dr. Mock]: Well, the peripheral sight on both eyes.

[Attorney Noonan]: Both eyes peripherally?

[Dr. Mock]: But it's worse in the left.

[Attorney Noonan]: When did that start to reach its current state of worsening?

[Dr. Mock]: I don't know. It's progressive.

(Document No. 31-6, pp. 40-41, 48-49; Document No. 31-7, pp. 1-2). Despite Dr. Mock's inability to

"compartmentalize" the effect that her multiple sclerosis had on her ability to perform certain functions,

the governing legal standard requires the Court to do so. The statute clearly states that the term

"disability" means, with respect to an individual, "a physical or mental impairment that substantially

limits *one or more* of the major life activities of such individual[.]" 42 U.S.C. § 12102(2)(A)(emphasis

added). It is not sufficient for Dr. Mock to establish that she has multiple sclerosis, or that this disease

moderately limits her ability to do different things. Although Dr. Mock's testimony could support a

finding that she was somewhat limited in certain major life activities, the critical question is whether she was *substantially limited* in *one or more* of her major life activities. "The ADA does not define 'substantially limits,' but 'substantially' suggests 'considerable' or 'specified to a large degree.'" *Sutton*, 527 U.S. at 491, 119 S.Ct. at 2150, 144 L.Ed.2d at 468.

In *Bragdon v. Abbott*, 524 U.S. 624, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998), the Supreme Court provided significant guidance as to how a court should determine whether a given impairment substantially limits a major life activity. In *Bragdon*, the Court held that a woman infected with human immunodeficiency virus ("HIV") could establish that she was "disabled" within the meaning of the ADA by showing that the virus substantially limited her ability to reproduce. *Bragdon*, 524 U.S. at 640-642, 118 S.Ct. at 2206-2208, 141 L.Ed.2d at 559-560. The Court explained:

> The Act addresses substantial limitations on major life activities, not utter inabilities. Conception and childbirth are not impossible for an HIV victim but, without doubt, are dangerous to the public health. This meets the definition of a substantial limitation.

*Bragdon*, 524 U.S. at 641, 118 S.Ct. at 2206, 141 L.Ed.2d at 559. It is clear that "[w]hen significant limitations result from the impairment, the definition is met even if the difficulties are not insurmountable." *Id.* Nevertheless, it is still incumbent upon the plaintiff in an ADA case to establish that a *particular* major life activity is *substantially limited* by the impairment. In *Bragdon*, the Court did not hold that HIV infection was a *per se* disability under the ADA. *Bragdon*, 524 U.S. at 641-642, 118 S.Ct. at 2207, 141 L.Ed.2d at 559 (declining to address the question of whether HIV infection constituted a *per se* disability under the ADA). In later cases, the Court has eschewed reliance on specific impairments without regard to the effect that those impairments have on the major life activities

31

of a particular individual. In *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 198, 122 S.Ct. 681, 691, 151 L.Ed.2d 615, 631 (2002), the Court declared that "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment." Since § 12102(2) defines disability "with respect to an individual," the Court reasoned that Congress' intent was for the existence of a disability to be determined in "a case-by-case manner." *Toyota Motor Manufacturing*, 534 U.S. at 198, 122 S.Ct. at 692, 151 L.Ed.2d at 631. Consequently, Dr. Mock cannot establish the existence of a "disability" under the ADA merely by showing that she suffered from multiple sclerosis during the relevant period of time.

In her brief, Dr. Mock makes no attempt to identify a major life activity that is *substantially limited* by her multiple sclerosis. (Document No. 39, p. 15). Instead, she attempts to establish the existence of a disability merely by asserting that this impairment had a "debilitating effect" on her health during the relevant period of time. (Id.). Under the governing legal standard, however, this is insufficient as a matter of law. The record contains no evidence that Dr. Mock was substantially limited in *one or more* of her major life activities. Indeed, Dr. Mock fails to even identify a major life activity that was substantially limited by her multiple sclerosis.[10] Although her testimony indicates that she anticipates becoming substantially limited in several major life activities *at some point*, there is no evidence which would enable a reasonable jury to conclude that she was so limited during the period of time in question. To survive summary judgment, she must provide specific facts establishing that

---

[10] To the extent that Dr. Mock believes that her vision problems constituted a "substantial" limitation in the major life activity of seeing, she is mistaken. Despite the difficulties that she experienced with respect to her peripheral vision, she was still able to drive. (Document No. 31-7, p. 1)(explaining that she "sometimes" had difficulty driving "at night"). Consequently, no reasonable jury could conclude that she was substantially limited in the major life activity of seeing. *Overturf v. Penn Ventilator Co., Inc.*, 929 F.Supp. 895, 898 (E.D.Pa. 1996).

there is a *genuine* issue of material fact as to whether she was *substantially limited* in a major life activity during the spring of 2003. *Scheerer v. Potter*, 443 F.3d 916, 919 (7th Cir. 2006). Although Dr. Mock may believe that this issue could be more fully developed in a trial, UPJ is entitled "to know now, at the summary judgment phase, what evidence" she has to establish that she was substantially limited in a major life activity. *Barclay v. Amtrak*, 435 F.Supp.2d 438, 447 (E.D.Pa. 2006). Given her express inability to "compartmentalize" the effect that her impairment had on various life activities, it is clear that no reasonable jury could conclude that she was substantially limited in *one or more* of her major life activities. Although her multiple sclerosis made life difficult for her in many ways, her testimony establishes that she was not substantially limited in her ability to care for herself, perform manual tasks, walk, see, hear, speak, breathe, learn or work during the spring of 2003.

Dr. Mock does not argue that she had a record of a disabling impairment or that she was regarded by UPJ as having a disabling impairment. Instead, she relies exclusively on § 12102(2)(A)'s actual disability standard to establish that she was a "qualified individual with a disability." (Document No. 39, p. 13)("In the Plaintiff's Complaint, the Plaintiff relies on the first prong of the ADA definition of disability to assert her claim against the Defendant."); (Document No. 1, ¶ 31)(alleging that she was a "qualified individual with a disability" because of her multiple sclerosis). Consequently, the Court has no occasion to consider whether Dr. Mock would be able to proceed under the ADA if she were relying on § 12102(2)(B) or § 12102(2)(C). Since Dr. Mock has failed to present evidence sufficient to enable a reasonable jury to conclude that she was substantially limited in a major life activity during the spring of 2003, she was not a "qualified individual with a disability" within the meaning of § 12112(a). Hence, she was not a member of the class of persons protected from discrimination by the

ADA. UPJ is entitled to summary judgment with respect to Dr. Mock's claim under the ADA.

## C. Gender Discrimination under Title VII

Count III of Dr. Mock's complaint alleges a violation of Title VII. (Document No. 1, ¶¶ 38-43).

UPJ does not dispute that it is "a person engaged in an industry affecting commerce who has fifteen or

more employees for each working day in each of twenty or more calendar weeks in the current or

preceding calendar year[.]" 42 U.S.C. § 2000e(b). Therefore, UPJ is an "employer" for purposes of

Title VII. It is likewise undisputed that Dr. Mock qualifies as an "employee" for purposes of 42 U.S.C.

§ 2000e(f). The applicable statutory language provides:

§ 2000e-2. Unlawful employment practices

(a) Employer practices. It shall be an unlawful employment practice for an employer--
      (1) to fail or refuse to hire or to discharge any individual, or otherwise to
discriminate against any individual with respect to his compensation, terms, conditions,
or privileges of employment, because of such individual's race, color, religion, sex, or
national origin; or
      (2) to limit, segregate, or classify his employees or applicants for employment
in any way which would deprive or tend to deprive any individual of employment
opportunities or otherwise adversely affect his status as an employee, because of such
individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). The standard for establishing unlawful gender discrimination under Title VII

is slightly different than the standard for establishing age discrimination under the ADEA. Under the

ADEA, a plaintiff must demonstrate that his or her age "actually motivated" and "had a determinative

influence on" the employer's decision not to hire him or her. *Glanzman v. Metropolitan Management*

*Corporation*, 391 F.3d 506, 512 (3d Cir. 2004). With respect to claims under Title VII, the standard

is more relaxed as a result of the Civil Rights Act of 1991, which added the following statutory

34

language:

> (m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices. Except as otherwise provided in this title [42 U.S.C. § 2000e *et seq.*], an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m).[11]  In *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 101-102, 123 S.Ct. 2148, 2155,

---

[11] Dr. Mock clearly intends to proceed under both a "pretext" theory and a "mixed-motive" theory. (Document No. 39, pp. 9-10). In *Watson v. Southeastern Pennsylvania Transportation Authority*, 207 F.3d 207, 220 (3d Cir. 2000), the United States Court of Appeals for the Third Circuit held that § 2000e-2(m) did not alter the distinction between "pretext" cases and "mixed-motive" cases, and that plaintiffs proceeding under a "pretext" theory must still show that sex was a *determinative* (rather than a *motivating*) factor for an employment practice.  In so holding, the Court of Appeals construed § 2000e-2(m) within the narrow confines of Justice O'Connor's opinion concurring in the judgment in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989).  *Watson*, 207 F.3d at 212-220.  Apparently, the Court of Appeals believed that § 2000e-2(m) was designed to overrule only the portion of Justice O'Connor's *Price Waterhouse* concurrence holding that an employer could avoid a finding of liability if it could prove that it would have taken the same action even absent the unlawful discriminatory motive.  *Id.* at 216.  This line of reasoning, however, was severely undermined by the Supreme Court's subsequent decision in *Desert Palace v. Costa*, which described as "flawed" the idea that § 2000e-2(m) should be construed only within the confines of Justice O'Connor's *Price Waterhouse* concurrence. *Desert Palace*, 539 U.S. at 98, 123 S.Ct. at 2153, 156 L.Ed.2d at 93 ("Like the Court of Appeals, we see no need to address which of the opinions in *Price Waterhouse* is controlling: the third step of petitioner's argument is flawed, primarily because it is inconsistent with the text of § 2000e-2(m)."). The language in *Watson* concerning the construction of the word "demonstrates" clearly contradicts the Supreme Court's subsequent decision in *Desert Palace*. Compare *Desert Palace*, 539 U.S. at 99, 123 S.Ct. at 2153-2154, 156 L.Ed.2d at 94 ("Moreover, Congress explicitly defined the term 'demonstrates' in the 1991 Act, leaving little doubt that no special evidentiary showing is required."), with *Watson*, 207 F.3d at 217-218 ("The use of this very term in Section 107(a) makes perfect sense if the drafters wished to denote cases in which the plaintiff shows by what Justice O'Connor called 'direct evidence' that an impermissible factor played a role in the challenged decision."). Although *Desert Palace* did not expressly address the distinction between "pretext" cases and "mixed-motive" cases, some of the language supporting the holding in *Watson* is plainly inconsistent with the later holding in *Desert Palace*. *Watson*, 207 F.3d at 218 ("By contrast, the term demonstrates is not the most apt choice if the drafters wanted to describe, not just cases in which the plaintiff offers 'direct' evidence of discriminatory animus, but also the great number of disparate treatment cases in which the plaintiff, proceeding under *McDonnell Douglas*, establishes the elements of a *prima facie* case and urges the factfinder to infer discriminatory animus from the employer's asserted failure to offer a credible alternative reason for the contested employment action."). In the instant case, there is no need for this Court to determine whether *Desert Palace* had the effect of abrogating *Watson*. Since Dr. Mock purports to proceed under *both* a "pretext" theory *and* a "mixed-motive" theory, § 2000e-2(m) is plainly applicable at least with respect to her "mixed-motive" theory. Moreover, the Court is convinced that Dr. Mock cannot defeat UPJ's Motion for Summary Judgment even under the more relaxed standard applicable under § 2000e-2(m), since no reasonable jury could conclude that her sex was a *motivating* factor in the decision not to hire her. For this reason, the Court assumes *arguendo* that she could proceed under either a "pretext" theory or a "mixed-motive" theory by demonstrating that her sex was a *motivating* (rather than a *determinative*) factor in UPJ's decision. Since UPJ is entitled to summary judgment even if it is assumed that § 2000e-2(m) is applicable with respect to both of Dr. Mock's theories of discrimination, it is clear that Dr. Mock would not be able to defeat UPJ's Motion for Summary Judgment

35

156 L.Ed.2d 84, 95-96 (2003), the United States Supreme Court held that direct evidence of discrimination is not required in order for a plaintiff to obtain a mixed-motive jury instruction under 42 U.S.C. § 2000e-2(m). Virginia A. Berlando, *Employment Discrimination Claimants are Not Required to Exhibit Direct Evidence of Discrimination: Desert Palace, Inc. v. Costa*, 6 Duq.B.L.J. 267, 268-283 (2004). "In order to obtain an instruction under § 2000e-2(m), a plaintiff need only present sufficient evidence for a reasonable jury to conclude, by a preponderance of the evidence, that 'race, color, religion, sex, or national origin was a motivating factor for any employment practice.'" *Desert Palace*, 539 U.S. at 101, 123 S.Ct. at 2155, 156 L.Ed.2d at 95-96.

As noted earlier, the elements of a *prima facie* case of unlawful employment discrimination depend on the precise nature of the particular dispute. *Jones*, 198 F.3d at 411. Dr. Mock's Title VII claim is based on a discriminatory failure to hire theory. (Document No. 1, ¶¶ 38-43). To establish a *prima facie* case of gender discrimination in this context, Dr. Mock must establish that: (1) she is a member of a protected class; (2) she applied for, and was qualified for, a position for which the employer was seeking applicants; (3) despite her qualifications, she was rejected; and (4) after she was rejected, the position remained open and the employer continued to seek applicants with her qualifications. *Hoechstetter v. City of Pittsburgh*, 248 F.Supp.2d 407, 409-410 (W.D.Pa. 2003). There

---

if she had the more difficult task of proving, under her "pretext" theory, that sex was a *determinative* factor in UPJ's hiring decision. This Court's analysis is consistent with the *Desert Palace* rationale, which focused on the statutory language of §§ 2000e-2(a)(1) and 2000e-2(m). Section § 2000e-2(m) amended the statutory text of § 2000e-2(a)(1), not merely the jurisprudence established in *Price Waterhouse*. *Quantum Chemical Corporation v. Toennies*, 47 S.W.3d 473, 478 (Tex. 2001)("Establishing an unlawful employment practice is, of course, the entire point of a plaintiff's suit, no matter how it is judicially classified."). Nevertheless, since Dr. Mock cannot prevail under either proposed construction of § 2000e-2(m), the Court need not address the question of whether this statutory language is applicable to her "pretext" theory. *Desert Palace*, 539 U.S. at 94, 123 S.Ct. at 2151, 156 L.Ed.2d at 91, n. 1 ("This case does not require us to decide when, if ever, § 107 applies outside of the mixed-motive context.").

is no dispute that Dr. Mock is a member of a protected class (i.e., sex), that she applied for a tenure-stream faculty position at UPJ, and that she was not selected for the position. The record clearly contains sufficient evidence to enable a reasonable jury to conclude that Dr. Mock was qualified for the position. Indeed, she was one of only two finalists chosen from a pool of 141 applicants. (Document No. 30, p. 20, ¶ 86, p. 26, ¶ 112). Moreover, Dr. Cox's letter recommending Dr. Magill for the position expressly asked that Dr. Robitaille permit the selection committee to interview someone other than Dr. Mock if Dr. Magill were to decline the position. (Document No. 41-4, p. 65)("Given the majority's concerns regarding Dr. Mock's preparation in American Literature, the Committee has decided that should Dr. Magill decline the position, we would like to request authorization to invite an additional candidate from the applicant pool for an on-campus interview and teaching demonstration rather than default to Mock in making any recommendation."). Given the undisputed evidence contained in the record, it is clear that Dr. Mock has established a *prima facie* case of gender discrimination under Title VII for purposes of UPJ's Motion for Summary Judgment.

The Court's conclusion that Dr. Mock has established a *prima facie* case of gender discrimination, of course, does not end the inquiry. The critical question is not whether UPJ chose not to hire her, but whether UPJ "fail[ed] or refuse[d] to hire" her because of her "sex." 42 U.S.C. § 2000e-2(a)(1). Moreover, under § 2000e-2(m), Dr. Mock can establish a violation of § 2000e-2(a)(1) by demonstrating that her sex was "a motivating factor" in UPJ's decision not to hire her, even if "other factors also motivated" that decision.[12] 42 U.S.C. § 2000e-2(m). Since Dr. Mock has established a

---

[12] Although not relevant to the Court's analysis in this case, it is worth noting that 42U.S.C. § 2000e-5(g)(2)(B) provides a partial affirmative defense for an employer able to demonstrate that it "would have taken the same action in the absence of the impermissible motivating factor[.]" 42 U.S.C. § 2000e-5(g)(2)(B). In such a case, a court can grant

*prima facie* case of gender discrimination, UPJ must articulate legitimate, nondiscriminatory reasons for not hiring Dr. Mock. *McDonnell Douglas*, 411 U.S. at 802-803, 93 S.Ct. at 1824-1825, 36 L.Ed.2d at 678.

UPJ bases much of its argument on Dr. Magill's allegedly superior qualifications for the tenure-stream position. (Document No. 29, pp. 8-17). UPJ's reliance on Dr. Magill's qualifications, however, is somewhat problematic because of Dr. Cox's indication to Dr. Robitaille that the selection committee would prefer to interview a third candidate rather than default to Dr. Mock if Dr. Magill were to decline the position. (Document No. 41-4, p. 65). Furthermore, an employer cannot defend a hiring decision against a Title VII claim merely by asserting that the person selected was "the right person for the job." *Iadimarco v. Runyon*, 190 F.3d 151, 166-167 (3d Cir. 1999). It is clear from the evidence of record that the selection committee's decision to recommend Dr. Magill had as much to do with the committee's reservations about hiring Dr. Mock as it did with the committee's enthusiasm about hiring Dr. Magill. The dispositive question, however, is whether sex was "a motivating factor" in that decision.

It is worth noting that the two members of the selection committee who initially preferred Dr. Magill over Dr. Mock were Dr. Cox and Dr. Derrick, both of whom are women. Dr. Cox testified that Dr. Mock's chances of getting the position were impaired by her inability to talk extensively about canonical authors in American literature. (Document No. 31-4, p. 23). Dr. Cox apparently encouraged Dr. Mock to apply for the position because her credentials were in the "ballpark" of what UPJ was

---

declaratory and injunctive relief, as well as "attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim" under § 2000e-2(m), but may not "award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment[.]" 42 U.S.C. § 2000e-5(g)(2)(B)(i)-(ii); *Desert Palace*, 539 U.S. at 94-95, 123 S.Ct. at 2151, 156 L.Ed.2d at 91, n. 2.

looking for, and because opportunities to apply for tenure-stream positions at UPJ were relatively rare. (Id., p. 5). Dr. Derrick testified that Dr. Mock appeared to have "serious gaps" in her knowledge of canonical authors in American literature. (Document No. 33-11, pp. 40-41). The evidence of record indicates that when a straw vote was taken to determine where the five members of the selection committee were leaning, Dr. Cox and Dr. Derrick voted for Dr. Magill and Dr. Scofield, Dr. Ritz and Dr. Newman voted for Dr. Mock. (Document No. 30, p. 29, ¶ 23). Thus, the two women on the committee favored Dr. Magill while the three men on the committee favored Dr. Mock.

Dr. Scofield testified that he considered Dr. Mock to be an expert in American literature. (Document No. 34-3, p. 3). Despite Dr. Cox's alleged attempts to point out Dr. Mock's deficiencies, Dr. Scofield voted for Dr. Mock when the final vote was taken and, hence, was the sole dissenter from the selection committee's final recommendation. (Id., pp. 6-7). According to Dr. Robitaille, Dr. Scofield did not believe that someone needed to have a high degree of specialization in a particular area in order to teach a course related to that area at the undergraduate level. (Document No. 34-4, p. 15). Although Dr. Ritz initially voted for Dr. Mock, he shifted his support to Dr. Magill after listening to Dr. Cox and Dr. Derrick discuss Dr. Mock's alleged deficiencies in American literature. (Document No. 34-2, pp. 16-19). Dr. Newman, who was on the selection committee precisely because he was not an expert in the discipline of literature, voted for Dr. Mock when the initial straw vote was taken. (Document No. 33-14, pp. 5-6). He indicated that this vote was just to see where everybody stood, rather than to establish a final decision. (Id., p. 5). Although he had initially leaned in favor of Dr. Mock because of her connection with UPJ, Dr. Newman testified that Dr. Mock seemed to be focused on the narrow category of women's literature rather than on the broader category of American literature.

39

(Id., p. 8). He did not understand Dr. Cox's recommendation to Dr. Robitaille that another applicant be considered if Dr. Magill were to decline the position to mean that Dr. Mock was being eliminated as a possible choice. (Id., p. 9). Apparently, Dr. Samples and Dr. Etheridge followed the recommendation made by the selection committee and Dr. Robitaille without conducting an independent investigation as to the qualifications of the two finalists. (Document Nos. 34-6, p. 13, 34-7, p. 9). Indeed, Dr. Samples did not even know that Dr. Scofield was the member of the selection committee who had voted for Dr. Mock. (Document No. 34-6, p. 15).

Essentially, what the Court is left with is a female plaintiff in a Title VII case who alleges that two women opposed her selection because of her sex, and that those two women ultimately convinced two of the three men to oppose her as well. It is, of course, true that a woman can discriminate against another woman on the basis of gender, and that Dr. Mock's Title VII claim cannot be dismissed *solely* because her primary allegations of discrimination are being leveled against two other women. *Ineichen v. Ameritech*, 410 F.3d 956, 959, n.1 (7th Cir. 2005); *Fredette v. BVP Management Associates*, 112 F.3d 1503, 1506 (11th Cir. 1997). Moreover, in this circuit, there is no "heightened standard" for plaintiffs alleging "reverse discrimination" (i.e., either discrimination in favor of a suspect classification or discrimination in which the offending party is within the victim's class). *Iadimarco*, 190 F.3d at 157-163. Nevertheless, the fact that the primary allegations of gender discrimination advanced by Dr. Mock are against two women has "evidentiary force" in support of UPJ's argument that Dr. Mock's gender was not a "motivating factor" in the decisionmaking process. *Pivirotto v. Innovative Systems, Inc.*, 191 F.3d 344, 354 (3d Cir. 1999)("The fact that a female plaintiff claiming gender discrimination was replaced by another woman might have some evidentiary force, and it would be prudent for a plaintiff

40

in this situation to counter (or explain) such evidence.").

In *Iadimarco v. Runyon*, 190 F.3d 151, 165-166 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit explained the standard that applies in a Title VII case in which the defendant has articulated legitimate, nondiscriminatory reasons for its decision:

"To defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to *some evidence*, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)(emphasis added). However, "if the plaintiff has pointed to evidence sufficient[] to discredit the defendant's proffered reasons, to survive summary judgment the *plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case*." *Id.* (emphasis added).

*Iadimarco*, 190 F.3d at 165-166 (emphasis and brackets in original). In this case, the evidence relied upon by Dr. Mock to establish a *prima facie* case under Title VII is not sufficient to enable a reasonable jury to disbelieve the reasons articulated by UPJ to justify its decision not to hire Dr. Mock for the tenure-stream position. While UPJ's decision not to hire Dr. Mock, *if left unexplained*, may have permitted a reasonable jury to draw an inference of unlawful discrimination, it is clear that the reasons given by UPJ obviate any argument to the effect that Dr. Mock was not hired because of her gender. The Court notes that Dr. Mock's brief does not discuss *gender discrimination* specifically, but instead discusses discrimination in a more general sense. (Document No. 39, pp. 14-29). The record contains *no* evidence to refute UPJ's articulated reasons for not hiring Dr. Mock (with respect to her claim of gender discrimination under Title VII). Despite the fact that Dr. Mock was apparently qualified for the tenure-stream position (which the Court assumes without deciding), and that a male was chosen instead

41

of her, the record is totally devoid of evidence sufficient to enable a reasonable jury to conclude that the reasons given by UPJ for its decision are merely a pretext for unlawful gender discrimination.

Dr. Mock devotes a considerable portion of her brief to explaining why she was more qualified than Dr. Magill to teach American Literature. (Id.). The Court notes that Dr. Robitaille has now given Dr. Mock the opportunity to teach American Literature courses, thereby acknowledging her competence in that area. (Document No. 34-5). Whether she should have been offered the tenure-stream position, however, is not for this Court to decide. UPJ has articulated legitimate, nondiscriminatory reasons for not offering her the position, and the record provides support for those reasons. Indeed, the notes taken by Dr. Derrick during the selection process reveal her concerns about Dr. Mock's alleged deficiencies in American Literature. (Document No. 33-13, p. 13)("American lit in general?"). To discredit UPJ's reasons for not hiring her, Dr. Mock must do more than show that UPJ's decision was "wrong or mistaken." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). The dispositive question, after all, is "whether discriminatory animus motivated [UPJ], not whether [UPJ] is wise, shrewd, prudent or competent." *Id.* In view of the fact that Dr. Mock makes no attempt to explain why two women on the selection committee acted with a discriminatory animus against her *because of her gender*, and the reality that the record is devoid of evidence that gender was a motivating factor in UPJ's decision, no reasonable jury could believe Dr. Mock's conclusory allegations of unlawful gender discrimination. (Document No. 39, p. 24)("Basically, Drs. Cox and Derrick sabotaged the process by seeking to have Dr. Magill put in the position because Dr. Mock is a female, over the age of forty (40), with a known disability."). Accordingly, UPJ is entitled to summary judgment with respect to Dr. Mock's claim under Title VII.

42

## D. Punitive Damages

UPJ argues that it is a "government agency" within the meaning of 42 U.S.C. § 1981a(b)(1) and, therefore, immune from an award of punitive damages. (Document No. 29, pp. 26-30). Dr. Mock seeks an award of "punitive damages" under the ADA. (Document No. 1, ¶ 37d). Nevertheless, the Court has already concluded that UPJ is entitled to summary judgment on the merits with respect to Dr. Mock's ADA claim, making a determination as to whether UPJ is a "government agency" under § 1981a(b)(1) unnecessary. Consequently, the Court will not address this question on the merits.

## VI. CONCLUSION

Dr. Mock has failed to present sufficient evidence to enable a reasonable jury to conclude that she was not offered the tenure-stream faculty position at UPJ because of her age or gender. For this reason, UPJ's Motion for Summary Judgment must be granted with respect to Dr. Mock's claims under the ADEA and Title VII. Moreover, Dr. Mock has merely assumed (without attempting to establish) that her multiple sclerosis rendered her a "qualified individual with a disability" for purposes of 42 U.S.C. § 12112(a). Since the record is devoid of evidence that Dr. Mock's impairment *substantially limited a major life activity* during the relevant period of time, no reasonable jury could conclude that she was within the class of persons entitled to protection under the ADA. The Court has no occasion to consider whether UPJ "regarded" Dr. Mock as disabled within the meaning of 42 U.S.C. § 12102(2)(C), since she has expressly chosen to rely exclusively on § 12102(2)(A) as a basis for establishing her "disability." (Document No. 39, p. 13)("In the Plaintiff's Complaint, the Plaintiff relies on the first prong of the ADA definition of disability to assert her claim against the Defendant."). Given the Court's determination that UPJ is entitled to summary judgment with respect to the merits of Dr.

43

Mock's ADA claim, the question of whether an award of punitive damages against UPJ would be precluded by 42 U.S.C. § 1981a(b)(1) is inconsequential.  Therefore, the Court will not decide this question.

Accordingly, the Court must grant UPJ's Motion for Summary Judgment (Document No. 28) in its entirety.  An appropriate order follows.

**AND NOW**, this 3rd day of August, 2007, this matter coming before the Court on the Defendant's Motion for Summary Judgment (Document No. 28), **IT IS HEREBY ORDERED** that the Motion is **GRANTED**.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc: All counsel of record**

44